FILED IN THE U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

MAR 18 2024

SEAN F. McAVOY, CLERK
SPOKANE, WASHINGTON

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NATHANIEL MANNY BALLANTYNE ) | |
| ) | Civil Action No.: **2:24-cv-00085-TOR** |
| Plaintiff, ) | |
| ) | |
| -against- ) | **Complaint** |
| ) | |
| GUENTHER MANAGEMENT LLC ) | **JURY TRIAL DEMANDED** |
| *DBA* GUENTER PROPERTY ) | |
| MANAGEMENT, ) | |
| VICTOR M, ) | |
| HUBERTUS GUENTHER, ) | |
| MISCHA GUENTER, ) | |
| ERICH GUENTER, ) | |
| SERGEY KHOLOSTOV, ) | |
| ) | |
| Defendants. ) | |

## I. PRELIMINARY STATEMENT

1. This year marks the 56th anniversary of the Fair Housing Act ("FHA"), a statute intended to end discrimination in housing markets throughout the United States. For decades, the Federal Fair Housing Act and Washington State laws have prohibited race discrimination in the selling and renting of real property, as well as the procedures by which Landlord or their agents collect information and determine whom to rent to. This prohibition is well-known and established – landlord and their agents cannot decide who they will rent based on Race, Sex, Family Status, Disability, National Origin, and other protected characteristics.

2. Given this milestone, it is all the more egregious and shocking that Defendants GUENTER MANAGEMENT, LLC *DBA* GUENTER PROPERTY MANAGEMENT,(hereinafter "GPM") its directors, managers and agents have maintained a PATTERN and PRACTICE of racial discrimination against Black and Hispanic rental applicants in violation of both federal and state laws.

3.  For several years, the GPM Defendants have systematically discriminated against Black and Hispanic rental applicants in certain parts of Spokane, Washington.

4.  Many houses for rent and sale in this city are controlled or managed by the GPM Defendant on behalf of their owners.

5.  The GPM Defendants have employed and maintained a practice and pattern of discrimination wherein in certain part of Spokane, such Moran Prairie, the GPM Defendant the rely on and manipulate rental criteria to deny housing to Black and Hispanic rental applicants.

6.  This pattern and practice of discrimination has been the bedrock of GPM Defendant's business in ensuring owners that their property would be rented to non-minority applicants.[1]

## II. **NATURE OF THE COMPLAINT**

7.  This is an action for declaratory judgment, permanent injunctive relief, damages, costs, and attorneys' fees, alleging a continuing pattern of racially discriminatory practices and conduct in violation of the Civil Rights Act of 1866 (codified at 42 U.S.C. §§ 1981, 1982, and 1983), the Fair Housing Act, enacted as Title VIII of the Civil Rights Act of 1968 (codified at 42 U.S.C. 3601-3619, the Washington Law Against Discrimination, Declaration of Civil Rights, RCW 49.60.030, the Washington Law Against Discrimination, Unfair Practices with Respect to Real Estate Transactions, 49.60.222(1)(b), and the Washington Residential Landlord-Tenant Act, at chapter RCW 59.18.257

---

[1] While this this Complaint is brought only on behalf of Plaintiff Ballantyne at this time, he anticipates that discovery will support amending the Complaint as a class action on behalf of all other similarly situated much like the recent class action case against Guenther in the Superior Court of Spokane County, (Case number 2020-2604-32), captioned *Miller, Jake, et al v Guenther Management, LLC.* As is explained in more detail below (see ¶¶ 92-98, infra), that case involved alleged systemic violations of Washington State rental laws regarding rental criteria and involving more than 1,000 rental applicants allegedly subjected to those violations.

8. Plaintiff Nathaniel Ballantyne, who is African American, also asserts causes of action for negligent infliction of emotional distress, intentional infliction of emotional distress, negligent retention, and negligent training and supervision.

## III. JURISDICTION AND VENUE

9. Jurisdiction is conferred on this Court by 42 U.S.C. § 3613(a)-(b) and by 28 U.S.C. §§ 1331, 1337, 1343 and 2201. The Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the related state law claims for negligent infliction of emotional distress, intentional infliction of emotional distress, negligent retention, negligent training and supervision, and discriminatory housing practices and landlord-tenant violations under the laws of Washington State.

10. Venue is proper in this District because the claims arose in the Eastern District of Spokane, in the State of Washington.

## IV. PARTIES

11. Plaintiff Nathaniel M. Ballantyne is an African American man and self-identifies as black. At all relevant times, Mr. Ballantyne has resided in the City of Spokane, State of Washington.

12. Corporate Defendant Guenther Management, LLC *dba* Guenther Property Management (hereinafter the GPM Defendant) is a Washington state corporation. Since 2000, GPM has been involved in Property Management, renting, and selling properties on behalf of clients. GPM's office is located at 500 2nd Avenue, Spokane, Washington, 99201.

13. Defendant VICTOR M. whose full name is not yet known, is the director or manager at GPM in charge of its racist policies and procedures.

14. Defendant HUBERTUS GUENTHER, upon information and believe is one of the owners of the GPM Defendant who has and maintained control of said corporation.

15. Defendant MISCHA GUENTHER, upon information and belief is one of the directors of the GPM Defendant and in charge of its policies and procedures and the day-to day affairs of the Corporation.

16. Defendant ERICH GUENTHER, upon information and believe is one of the directors of the GPM Defendant in charge of its policies and procedures and maintains control of the corporation's day-to-day affairs.

17. Defendant SERGEY KHOLOSTOV, upon information and belief is the named agent of the GPM Defendant in charge of its legal affairs, and said agents maintains control of the corporation.

18. All named defendants are collectively referred to herein as the "GPM Defendants."

## V. FACTUAL ALLEGATIONS

### GPM's Reliance on Credit History Disporportionally Disadvantages Black and Hispanic Consumers

19. The GPM Defendants' decision to accept or denial a rental applicant is based in significant part on the applicant's credit scores and history.

20. Credit reports and scores are not intended to gauge whether someone will be a good tenant. They are designed to predict the likelihood that a borrower will become 90 days late on a loan-not rent, which is a different sort of obligation.[2] What's more, credit reports tell a history about past ability to pay in particular instances, not current ability to pay rent.

---

[2] Consumer Fin. Prot. Bureau, Data Point: Credit Invisibles 7 (2015), available at https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf at 7 (most credit scoring models built to predict likelihood relative to other borrowers that consumer will become 90 or more days past due in the following two years).

21. Credit histories include only a limited set of data, primarily consisting of loan account information, which is another reason they are not good predictors of whether a consumer will pay rent. For example, credit histories include a complete record of a consumer's expenses. Many essential and recurring bills, such as childcare, internet, or cell phone payment histories do not influence a consumer's credit score.

22. Credit histories rarely, if ever, capture a consumer's complete history as a renter. A consumer's credit score does not typically consider how long that consumer has rented property, if that consumer has a history of on-time past rental payments, or even if that consumer has rented property within their lifetime.

23. Because tenants recognize the importance of paying their rent, rental payments are paid on-time more than many other kinds of bill, including credit card bills. A 2019 Federal Reserve study concluded that both consumers expecting to defer on at least one bill and U.S. consumers in general would default on their credit card bills (45 percent and 7 percent respectively) rather than their rent or mortgage payment (23 percent and 4 percent respectively).[3]

24. Credit score and conventional credit history are not accurate predictors of timely rental payments. Moreover, reliance on such data in scoring potential tenants has a disproportionately adverse impact on Black and Hispanic tenants.[4]

---

[3] Board of Governors of the Federal Reserve System, Report on the Economic Well Being of U.S. Households in 2019, May 14, 2020, at Table 9, available at https://www.federalreserve.gov/publications/2020-economic-well-being-of-us-households-in-2019-dealing-with-unexpected-expenses.htm ; *see also* Matthew Desmond, *The Rent Eats First, Even During a Pandemic*, N.Y. Times (Aug. 29, 2020), available at www.nytimes.com/2020/08/29/opinion/sunday/coronavirus-evictions-superspreader.html (stating that "the rent eats first").

[4] National Fair Housing Alliance, "Discriminatory Effects of Credit Scoring on Communities of Color, available at https://nationalfairhousing.org/wp-content/uploads/2017/04/NFHA-credit-scoring-paper-for-Suffolk-NCLC-symposium-submitted-to-Suffolk-Law.pdf at 13-24 ("Credit Scoring Has a Discriminatory Impact and is Not the Best Measure of Risk").

25. As of October 2021, Black consumers have a median credit score of 612 and Hispanic consumers have a median credit score of 661; white consumers have a median credit score of 725.[5]

26. As of October 2021, approximately 45.1 percent of Black consumers and 31.5 percent of Hispanic consumers have subprime credit scores; 18.3 percent of white consumers have subprime credit scores.[6]  When scores are below a certain cut-off they are deemed "subprime" and the consumer is offered less favorable credit terms, if they are offered credit at all.

27. Credit scoring models, and the scores that they produce, consider past credit data which is systemically and historically biased against non-white consumers.[7]  As explained by Princeton University's Professor Frederick Wherry, "The data used in current credit scoring models are not neutral; it's a mirror of inequalities from the past. By using this data we're amplifying those inequalities today. It has striking effects on people's life chances."[8]

28. "Racial disparities in credit health reflect historical inequities that reduced wealth and limited economic choices for communities of color."[9]  Racial inequalities in wealth have existed within this country since its founding, and the racial wealth divide within the United

---

[5]     Urban Institute, "Credit Health During the COVID-19 Pandemic," URBAN.ORG, available at https://apps.urban.org/features/credit-health-during-pandemic/.

[6]     Urban Institute, "Credit Health During the COVID-19 Pandemic," URBAN.ORG, available at https://apps.urban.org/features/credit-health-during-pandemic/.

[7]     National Fair Housing Alliance, "Discriminatory Effects of Credit Scoring on Communities of Color, available at https://nationalfairhousing.org/wp-content/uploads/2017/04/NFHA-credit-scoring-paper-for-Suffolk-NCLC-symposium-submitted-to-Suffolk-Law.pdf   at 7-12 ("The Nation's Dual Credit Market Rooted in Discrimination").

[8]     See Natalie Campisi, "From Inherent Racial Bias to Incorrect Data—The Problems With Current Credit Scoring Models" Forbes, 26 Feb. 2021, https://www.forbes.com/advisor/credit-cards/from-inherent-racial-bias-to-incorrect-data-theproblems-with-current-credit-scoring-models/ at 5.

[9]     Urban Institute, "Credit Health During the COVID-19 Pandemic," URBAN.ORG, available at https://apps.urban.org/features/credit-health-during-pandemic/ at 1.

States has especially worsened over the last thirty years.[10]    As of 2017, "African American families own less than seven cents for every dollar in wealth owned by white families, while Latino households own less than eight cents for every dollar of white wealth."[11]

29. Racial disparities in credit health not only reflect historical racial disparities in wealth, but also *perpetuate* wealth inequalities through reduced financial opportunities and fewer financial safety nets, which hinder a consumer's ability to accumulate present or intergenerational wealth through homeownership or other financial investments. "The credit score disparity between predominantly white and non-white areas might be a contributing factor to worsening wealth inequality. In 1963, the average wealth of white families was $121,000 higher than the average wealth of non-white families. By 2016, the average wealth of white families was more than $700,000 higher than that of black and Hispanic families."[12]

30. Because Black consumers historically have not had equal footing to establish intergenerational wealth, "[t]he burden of poverty can trickle down to children who are at a disadvantage when it comes to being scored using today's methods." Black consumers are not

_____

[10]    Board of Governors of the Federal Reserve System, Survey of Consumer Finances -2019, https://www.federalreserve.gov/econres/scf/dataviz/scf/chart/#series:Net_Worth;demographic:ra cecl4;population:all;units:median;range:1989,2019.

[11]    The National Consumer Law Center, "Past Imperfect: How Credit Scores and Other Analytics "Bake In" and Perpetuate Past Discrimination," May 2016, available at https://www.nclc.org/images/pdf/credit_discrimination/Past_Imperfect050616.pdf at 1.

[12]    Caroline Ratcliffe and Steven Brown, "Credit scores perpetuate racial disparities, even in America's most prosperous cities, " Urban Institute, Nov. 20, 2017, available at https://www.urban.org/urban-wire/credit-scores-perpetuate-racial-disparities-even-americasmost-prosperous-cities at 4

likely to have the same payment history as their white peers given "the enormous disparity in wealth-generating opportunities."[13]

31. In the U.S., majority-Black communities have the lowest median credit scores, the highest debt in collection rates, the highest subprime credit score rates, and the highest use of high-cost payday and other Alternative Financial Services loans.[14]

32. These disparities begin at a young age and persist throughout life. As explained by Aaron Klein, Senior Fellow of Economic Studies at the Brookings Institution, "Children of wealth have been in the system for a long time. Their parents might open a credit card in their name and help them make payments each month. Children in poverty do not enter the system at an early age and, if they do, it's to inherit debt from parents. Plenty of parents in financial difficulty take out credit in their children's names."[15]

### The GPM Defendant's Awareness that Credit Scores have had a Disparate Impact on Black and Hispanic Persons Seeking to Rent and Purchase real estate dwellings.

33. The GPM Defendant is a real estate firm that conducts real estate brokerage services in the Washington State, and as such, is required to acquire and maintain a "real estate firm" licence pursuant to RCW 18.85, titled Real Estate Brokers and Managing Partner. *See* e.g., RCW 18.85.011(14 & 18).

---

[13] See Natalie Campisi, "From Inherent Racial Bias to Incorrect Data—The Problems With Current Credit Scoring Models" Forbes, Feb. 26, 2021, https://www.forbes.com/advisor/credit-cards/from-inherent-racial-bias-to-incorrect-data-theproblems-with-current-credit-scoring-models/ at 6

[14] Urban Institute, "Credit Health During the COVID-19 Pandemic," URBAN.ORG, available at https://apps.urban.org/features/credit-health-during-pandemic/ at 3.

[15] See Natalie Campisi, "From Inherent Racial Bias to Incorrect Data—The Problems With Current Credit Scoring Models" Forbes, 26 Feb. 2021. https://www.forbes.com/advisor/credit-cards/from-inherent-racial-bias-to-incorrect-data-theproblems-with-current-credit-scoring-models/ at 6.

34. Pursuant to RCW 18.85.011, the GPM Defendant is required to designate a natural person to act as a "designated broker on behalf of the real estate firm" *See* RCW 18.85.011(10).

35. The designated broker is required to supervise the conduct of other firm brokers and managing brokers for compliance with RCW 18.85. See RCW 18.85.275(1).

36. The designated broker is required to acquire and maintain a "managing broker's license" that further receives an endorsement from the Washington Department of Licensing of "designated broker". See RCW 18.85.011(10b).

37. To acquire the managing broker's license, the designated broker is required to complete at least 90 hours of real estate education and pass both national and state real estate broker's exam. *See* https://dol.wa.gov/professional-licenses/real-estate-managing-brokers/get-your-license-real-estate-managing-broker.

38. As of June 1, 2023, all active licensed brokers and managing brokers were required to take an approved Fair Housing course. The first active renewal after June 1, 2022, must include a 6-hour Fair Housing course. Every subsequent renewal requires the 3-hour Fair Housing course.[16]

39. The fair house real course covers the historical and societal context of housing discrimination, the legal framework intended to prevent housing discrimination,[17] and steps you should take to prevent housing discrimination. The course includes reviews of several federal and state court cases to illustrate the application of fair housing laws in real-world

---

[16] Washington State, Fair Housing Curriculum (3 Hour)(May 2022) available at https://dol.wa.gov/sites/default/files/2023-04/real-estate-fair-housing-curriculum-3hr.pdf

[17] Including the federal Fair Housing Act (42 U.S.C. 3601 et seq.) and the Washington Law Against Discrimination (ch 49.60 RCW) and other federal/state/regulations, and specific local ordinances/laws.). See Washington State, Fair Housing Curriculum (3 Hour)(May 2022) https://dol.wa.gov/sites/default/files/2023-04/real-estate-fair-housing-curriculum-3hr.pdf at p.5.

situations.[18] This comprehensive course provides a new look at prohibited conduct and offers some practical applications to help keep you in compliance.

40. Well prior to the discriminatory conduct that is alleged in this Complaint, the GPM Defendant, and its designate broker were aware of widely publicized studies, articles and reports detailing empirical evidence establishing the discriminatory effects of credit scoring on communities of color with respect to real estate transactions and lending.  For instance, all of the following articles, reports or studies were released prior to December 2023.

- National Fair Housing National Fair Housing Alliance, "Discriminatory Effects of Credit Scoring on Communities of Color, **June 6, 2012** available at https://nationalfairhousing.org/wp-content/uploads/2017/04/NFHA-credit-scoring-paper-for-Suffolk-NCLC-symposium-submitted-to-Suffolk-Law.pdf

- Lisa Rice* & Deidre Swesnik, "Discriminatory Effects of Credit Scoring on Communities of Color" **2013**, available at https://cpb-us-e1.wpmucdn.com/sites.suffolk.edu/dist/3/1172/files/2014/01/Rice-Swesnik_Lead.pdf.
- Race, Racism and the Law, "Discriminatory Effects of Credit Scoring on Communities of Color", **January 7, 2014,** https://racism.org/articles/basic-needs/economic-issues-and-race/1722-creditscoring001

- Housing and Urban Development, "impact of Credit Scoring on Under-Served Markets", **2015,** https://www.hud.gov/sites/documents/CREDITSCORINGPRES.PDF

- Columbia Human Rights Law Review, "Locked Out by Big Data: How Big Data, Algorithms and Machine Learning May Undermine Housing Justice", **2020,** available at https://hrlr.law.columbia.edu/hrlr/locked-out-by-big-data-how-big-data-algorithms-and-machine-learning-may-undermine-housing-justice/?ref=cecna.io

- Forbes, "From Inherent Racial Bias to Incorrect Data—The Problems With Current Credit Scoring Models", **February 26, 2021,** available at

---

[18]     Washington State, Fair Housing Curriculum (3 Hour)(May 2022) https://dol.wa.gov/sites/default/files/2023-04/real-estate-fair-housing-curriculum-3hr.pdf at p.5-7.

https://www.forbes.com/advisor/credit-cards/from-inherent-racial-bias-to-incorrect-data-the-problems-with-current-credit-scoring-models/

☐ The Fair Housing Center for Rights and Research, "Credit Inequality Undermines Access to Fair Housing and Opportunity", **August 30, 2022**, available at https://www.thehousingcenter.org/credit-inequality-undermines-access-to-fair-housing-and-opportunity/

☐ Housing Matters, "How Tenant Screening Services Disproportionately Exclude Renters of Color from Housing", **December 21, 2022**, https://housingmatters.urban.org/articles/how-tenant-screening-services-disproportionately-exclude-renters-color-housing.

☐ Public Justice, "The Discriminatory Impact of Credit Scores", **April 4, 2023**, available at https://www.publicjustice.net/the-discriminatory-impact-of-credit-scores/.

41. Thus, well prior to the discriminating conduct that is at issue in this case, the GPM

Defendants were fully aware that reliance on credit scores by lenders, housing providers and

property managers has had a disparate impact on Black and Hispanic applicants seeking to rent

and purchase real estate dwellings.

### Defendant GPM's Stated Non-Discrimination Policy

42. The GPM Defendant's website includes a section titled "Non-discrimination and

Reasonable Accommodation Policies", which states, in relevant part, that:

> Guenther Property Management does [] business in accordance with the Federal Fair Housing Act and the Washington State Law Against Discrimination.

> Non-discrimination Policy: It is the policy of Respondent and its management staff to comply with the Washington Law Against Discrimination by ensuring that rental housing is available to all persons without regard to race, color, religion, national origin, citizenship or immigration status, sex, sexual orientation, marital status, familial status, honorably discharged veteran or military status, or disability. This policy means that, among other things, Respondent cannot and will not choose tenants, set lease terms, use rental policies, evict tenants, or make other decisions about tenants or prospective tenants based on the characteristics listed in the preceding sentence. This policy applies to Respondent's agent(s), manager(s), employee(s), and representative(s) involved in the rental, management, and/or creation or application of policies concerning rental dwellings, and any such agent, manager, employee, or representative who fails to comply with this policy will be subject to appropriate disciplinary action.

*See* https://guenthermanagement.com/fair-housing at Non-discrimination Policy.

**Defendant GPM's Awareness that its Brokers and Agents Employed Policies and Procedures That had a Disparate Impact on Black and Hispanic Rental Applicants**

43. With the knowledge that reliance on credit scores by lenders, housing providers and property managers has had a disparate impact on Black and Hispanic rental applicants, the GPM Defendant knew, or should have known, that the policies and practices that its designated broker(s), managing broker(s), agents, and employees established and maintained (i.e., reliance on credit scores as determinative criteria for rental applications) would have a disproportionate adverse impact on Black and Hispanic rental applicants in violation of the fair housing law.

44. Similarly, with the knowledge that reliance on credit scores by lenders, housing providers and property managers has had a disparate impact on Black and Hispanic rental applicants, the GPM Defendant knew, or should have known, that the policies and practices that its designated broker(s), managing broker(s), agents, and employees established and maintained (i.e., reliance on credit scores as determinative criteria for rental applications) would have a disproportionate adverse impact on Black and Hispanic rental applicants in violation of the GPM Defendant's own claims on its website that:

- ☐ It is the policy of [the GPM Defendant] and its management staff to comply with the Washington Law Against Discrimination by ensuring that rental housing is available to all persons without regard to race, color, religion, national origin, citizenship or immigration status, sex, sexual orientation, marital status, familial status, honorably discharged veteran or military status, or disability.

- ☐ This policy means that, among other things, [the GPM Defendant] cannot and will not choose tenants, set lease terms, use rental policies, evict tenants, or make other decisions about tenants or prospective tenants based on the characteristics listed in the preceding sentence.

- ☐ This policy applies to [the GPM defendant's] agent(s), manager(s), employee(s), and representative(s) involved in the rental, management, and/or creation or application of policies concerning rental dwellings, and

- ☐ [A]ny such agent, manager, employee, or representative who fails to comply with this policy will be subject to appropriate disciplinary action.

See https://guenthermanagement.com/fair-housing at Nondiscrimination Policy.

45. Despite the awareness and knowledge identified in the preceding paragraphs, the GPM Defendant hired and retained its designated broker(s), managing broker(s), agents, and employees without taking any actions to correct their illegal conduct and or subjecting them to any disciplinary action in violation of the fair housing laws and its own stated non-discrimination policy.

46. Because the GPM Defendant's designated broker(s), managing broker(s), agents, and employees discriminatory conduct was in contradiction of the GPM's own expressed Non-discrimination Policy, they were acting outside of the scope of their employment.

47. The GPM Defendant had knowledge of its offending Designated Broker's, Managing Broker's, Agent's and employees' unfitness with regards to their discriminatory acts and omissions and/or failed to exercise reasonable care to discover their unfitness when it retained them and continued to employ them.

## The GPM Defendants Presented a Risk of Harm

48. Because the GPM Defendants employed acts and omissions that intentionally discriminated against Black and Hispanic rental applicants, and/or employed policies and procedures that have been statistically proven to cause an adverse disparate impact against Black and Hispanic rental applicants, the GPM Defendants presented a risk of harm to Black and Hispanic rental applicants, including Plaintiff Ballantyne.

## The GPM' Defendant's Knowledge That its Brokers, Agents and Employees Presented a Risk of Harm

49. Because the awareness and knowledge specified in the preceding paragraphs, the GPM Defendant knew, or should have known with the exercise of reasonable care, that the offending

designated broker(s), managing broker(s), agents, and employees presented a risk of harm of

Black and Hispanic rental applicants, including Plaintiff Ballantyne.

## Defendant GPM's Negligent Hiring, Retention and Supervision Cause Plaintiff Ballantyne's Injury

50. The GPM Defendant's negligence caused Plaintiff Ballantyne's injury

## Plaintiff Ballantyne's Experience

51. In about December 2023, Plaintiff Ballantyne began looking for a home to rent in Moran Prairie (an exclusive section of the South Hill Part of Spokane).

52. On December 18, 2023, Plaintiff Ballantyne saw an advertisement on the website Zillow for a rental property located at 1606 East 65th Street in the westside of South Hill (hereinafter "the Property").

53. Plaintiff Ballantyne contacted the agent via email at the email address listed in the advertisement requesting a walkthrough to view the Property.

54. According to the records of the City of Spokane, the owner of the Property is the Rosman 2000 Revocable Trust with an address in Pacific Palisades in California.

55. The GPM Defendants are the rental agents for the owner of the Property.

56. On December 19, 2022, Plaintiff Ballantyne spoke to a representative of GPM about his request to view the Property, and a showing was set up for later that day at 2 pm.

57. However, prior to the showing time, the GPM Defendants cancelled the showing via a text message to Plaintiff Ballantyne.

58. Plaintiff Ballantyne then called GPM's office to ask why the showing was cancelled and request rescheduling. He was told that he was supposed to have called an hour before the showing to confirm.

59. Plaintiff Ballantyne told the female representative that he had confirmed the showing at 10 am that same morning. She then said she would call him back to let him know whether they would re-schedule the showing.

60. At about 1:30 pm that same day, Plaintiff Ballantyne received a call from female representative of the GPM Defendants' who identified herself as "Cindy" stating that someone from the office would meet him at the Property at 2:30 pm.

61. Later that afternoon, Plaintiff Ballantyne, accompanied with a witness, was begrudgingly shown the Property.

62. During the showing, Plaintiff Ballantyne asked the agent why the property had not been rented in the 78 days it was listed on the rental platforms, and whether there were any pending offers on the property. The agent replied that "it has been hard renting this property".

63. Before leaving the property showing, Plaintiff Ballantyne asked the agent to go over the rental requirements. The agent reviewed the requirements on her tablet and said the monthly rent was $ 3,200 and the rental criteria was a credit score of 600+ and a monthly income of 3 times the monthly rent.

64. Since the property seemed to be below rental market value, Plaintiff Ballantyne asked the agent to again verify the requirements which she did.

65. At the end of the showing, Plaintiff Ballantyne told the agent that he was interested in renting the property and requested an application.

66. Later that night, Plaintiff Ballantyne received an application from Cyndy Connoli an agent at GPM.

67. The same night, Plaintiff Ballantyne submitted his application with an application fee of $30. At the time his application was submitted, Plaintiff Ballantyne met all stated rental criteria (i.e., his credit score was 600+ and his monthly income was over three times the monthly rent).

68. On December 21, 2023 Plaintiff Ballantyne received a copy of his background check verifying credit scores, income and other requirements, all of which met the GPM Defendants' rental requirements.

69. When Plaintiff Ballantyne did not hear back from the GPM Defendants, he called their office to inquire as to the status and spoke to a representative who told him that someone would get back to him later that week.

70. On December 22, 2023 Plaintiff Ballantyne reviewed the Property online rental listing again and noticed that the 600+ credit scores had been increased to 700+ the same day that Plaintiff Ballantyne had received his background report.

71. Surprised by this, Plaintiff Ballantyne called the GPM Defendants' office to inquire as to why the required credit score was suddenly changed after he had submitted his application and on the same day that the GPM Defendants received his background check and credit score.

72. When Plaintiff Ballantyne did not get an answer, he called the GPM Defendants' office several more times to no avail.

73. On December 26, 2023, Plaintiff Ballantyne sent an email to the GPM Defendant to again inquire about the change in credit score from 600+ to 700+.

74. On December 27, 2023. Plaintiff Ballantyne received an email from the Manager Victor M. stating that the Property was rented to another applicant.

75. The GPM Defendants employed a policy to intentionally exclude black rental applicants from consideration. The initially stated credit score is actually immaterial, and in

fact pretextual and changed, as necessary, by the GPM Defendants to exclude black rental applicants.

76. The only real criteria relevant the GPM Defendants' determination of whether to rent is the applicant's skin color.

77. Plaintiff Ballantyne was denied the rental on the Property solely because he is black and based on an after-the-fact change to the credit score criteria wherein the GPM Defendants increased the minimal credit score from 600+ to 700+ after they became aware that Mr. Ballantyne's credit score met the initially stated criteria of 600+.

78. In this case, the GPM Defendants' discriminatory rental policy was as follows, first the GPM Defendants publish a pre-textual rental criteria requirement with the listing. If a Black or Hispanic person applies and meets all the requirements, the GPM Defendants then surreptitiously increase the credit score requirement above the Black or Hispanic rental applicant's credit score to ensure the that the Black or Hispanic rental applicant no longer meets the rental criteria and is excluded from considerations. Meanwhile, the GPM Defendants keep the application fee and any other fees with no intention of ever having rented to a Black or Hispanic person

79. As a direct result of this denial, Plaintiff Ballantyne felt disappointed, destressed, depressed, rejected and worried that he would not be able to find an apartment because of his race.

80. Plaintiff Ballantyne has suffered severe emotional distress, violation of his rights, and economic damages, including but not limited to loss of a valuable housing opportunity, as a result of the GMP Defendants' discriminatory acts.

81. As a result of Defendants' discriminatory practices, Plaintiff had to rent an inferior place, with less space, and substantially more money.

82. It is a violation of the federal Fair Housing Act of 1968 and the state of Washington Civil Rights Act for any person to refuse to rent a dwelling to any other person because of their race.

83. Moran Prairie is an exclusive neighborhood, part of the South Hill in Spokane. Nearly 90 percent of the 34,013 residents are Caucasian with an annual household income of $112,803. Only 1.6% percent are Black and 2.9% Hispanic[19] The GPM Defendants, as a long-time property managers, instituted a racial policy that guarantees that exclusive neighborhoods, like Moran Prairie, continues to stay White as the GPM Defendants categorically refused to rent to initially qualified black applicants.

## VI. LEGAL BACKGROUND

### Fair Housing Act of 1968

84. The federal Fair Housing Act of 1968 (hereinafter the FHA) states, in relevant part, that it shall be unlawful—

    a. To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any_because of race, color, religion, sex, familial status, or national origin.

    b. To discriminate against any person_in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

---

[19] See Household Income in Moran Prairie, Spokane, Washington (Neighborhood), https://statisticalatlas.com/neighborhood/Washington/Spokane/Moran-Prairie/Household-Income

See 42 U.S. Code § 3604 - Discrimination in the sale or rental of housing and other prohibited practices.

85. The FHA "has been interpreted to prohibit not just intentional discrimination but also actions that have a discriminatory effect based on race (disparate-impact discrimination). See *Pfaff v. U.S. Dep't of Hous. Urban Dev.*, 88 F.3d 739, 745-46 (9th Cir. 1996). "'Discriminatory effect' describes conduct that actually or predictably resulted in discrimination" Id. at 745.

86. The FHA's implementing regulations make clear that this prohibition extends to all persons engaged in the sale or rental of a dwelling. See 24 C.F.R. § 100.75(b) (2006).

## Washington Law Against Discrimination
### (Declaration of Civil Rights)

87. The state of Washington Law Against Discrimination ("WLAD"), at chapter RCW 49.60.030, titled Freedom from discrimination—Declaration of civil rights, states in relevant part that:

> (1) The right to be free from discrimination because of race … is recognized as and declared to be a civil right.  This right shall include, but not be limited to:
>
> (a) …
> (b) …
>
> (c) The right to engage in real estate transactions without discrimination, including discrimination against families with children;
>
> (2) Any person deeming himself or herself injured by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction to enjoin further violations, or to recover the actual damages sustained by the person, or both, together with the cost of suit including reasonable attorneys' fees or any other appropriate remedy authorized by this chapter or the United States Civil Rights Act of 1964 as amended, or the Federal Fair Housing Amendments Act of 1988 (42 U.S.C. Sec. 3601 et seq.).

See RCW 49.60.030 (1)(c-d) and (2).

## Washington Law Against Discrimination
### (Unfair Practices with Respect to Real Estate Transactions)

88. The WLAD, at chapter RCW 49.60.222(1)(b), titled Unfair Practices with Respect to Real Estate Transactions [], specifically prohibits "discriminat[ion] against a person in the terms, conditions, or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith" on the basis of race. "Real estate transaction" is defined as "includ[ing] the sale, appraisal, brokering, exchange, purchase, rental, or lease of real property, transacting or applying for a real estate loan, or the provision of brokerage services." See RCW 49.60.040(22).

89. This chapter also specifically prohibits "discriminat[ion] in the sale or rental, or to otherwise make unavailable or deny a dwelling, to any person", RCW 49.60.222(1)(f), "discriminat[ing] in the course of negotiating, executing, or financing a real estate transaction", RCW 49.60.222(1)(j), and the "offer[ing], solicit[ing], accept[ing], us[ing], or retain[ing] a listing of real property with the understanding that a person may be discriminated against in a real estate transaction", RCW 49.60.222(1)(h).

## Washington Law Against Discrimination
### (Unfair Practices to Aid Violation)

90. The WLAD, at Chapter RCW 49.60.220, titled Unfair Practice to Aid Violation, states in relevant part that "[i]t is an unfair practice for any person to aid, abet, encourage, or incite the commission of any unfair practice, or to attempt to obstruct or prevent any other person from complying with the provisions of this chapter." RCW 49.60.220

## Washington Residential Landlord-Tenant Act

91. The state of Washington Residential Landlord-Tenant Act, at chapter RCW 59.18.257, titled "Screening of prospective tenants—Notice to prospective tenant—Costs—Adverse action notice—Violation", states in relevant part, at paragraph one that:

> (a) Prior to obtaining any information about a prospective tenant, the prospective landlord shall first notify the prospective tenant in writing, or by posting, of the following:
>
>> (i) What types of information will be accessed to conduct the tenant screening;
>>
>> (ii) *What criteria may result in denial of the application*;
>>
>> (iii) If a consumer report is used, the name and address of the consumer reporting agency and the prospective tenant's rights to obtain a free copy of the consumer report in the event of a denial or other adverse action, and to dispute the accuracy of information appearing in the consumer report; and
>
> (b)(i) The landlord may charge a prospective tenant for costs incurred in obtaining a tenant screening report only if the prospective landlord provides the information as required in (a) of this subsection.
>
> (c) If a prospective landlord takes an adverse action, the prospective landlord shall provide a written notice of the adverse action to the prospective tenant that states the reasons for the adverse action. The adverse action notice must contain the following information in a substantially similar format, including additional information as may be required under chapter 19.182 RCW:
>
> "ADVERSE ACTION NOTICE
>     Name
>     Address
>     City/State/Zip Code
>     This notice is to inform you that your application has been:
>     ..... Rejected
>     ..... Approved with conditions:
>     ..... Residency requires an increased deposit
>     ..... Residency requires a qualified guarantor
>     ..... Residency requires last month's rent
>     ..... Residency requires an increased monthly rent of $........
>     ..... Other:
>     Adverse action on your application was based on the following:
>     ..... Information contained in a consumer report (The prospective landlord must include the name, address, and phone number of the consumer reporting agency that furnished the consumer report that contributed to the adverse action.)
>     ..... The consumer credit report did not contain sufficient information
>     ..... Information received from previous rental history or reference
>     ..... Information received in a criminal record
>     ..... Information received in a civil record

..... Information received from an employment verification
Dated this ..... day of ........, ....(year)
Agent/Owner Signature"

## VII.  PRIOR CLASS ACTION LAWSUIT AGAINST THE GPM DEFENDANT BY TENANTS ALLEGING VIOLATIONS OF THE WASHINGTON RESIDENTIAL LANDLOR-TENNANT ACT, RCW 59.18.257

92. On September 9, 2020, Jake and Doreen Miller filed a class action complaint against Guenther Management, LLC, on behalf of themselves and all others similarly situated, in the Superior Court of Spokane County, (Case number 2020-2604-32), captioned *Miller, Jake, et al v Guenther Management, LLC.*

93. The Complaint alleged, among other things, that the Guenther Management, LLC received rental applications and charged tenant screening fees without first providing required disclosures to prospective tenants, in violation of Washington State law, RCW 59.18.257. *See* Docket No. 2020260432, at Sub Number 1.

94. Specifically, the Complaint alleged, in relevant part, that: "Defendant's practice of failing to disclose what criteria may result in denial of prospective tenants' applications for tenancy violates RCW 59.18.257(1)(a)(ii). *See* Docket No. 2020260432, at Sub Number 1 at ¶ 5.12.

95. The Complaint alleged that the violations of RCW 59.257 occurred with respect to "more than one thousand 1,000 prospective Washington tenants" during the "rental application process". *See* Docket No. 2020260432, at Sub Number 1 at ¶ 5.19.

96. Following the filing of the Complaint, Guenther Management, LLC entered into a settlement agreement with the Plaintiff's in which Defendant Guenther agreed to pay a settlement amount of $130,015.00 which will be used to create a Settlement Fund to pay cash awards to Settlement Class Members, pay Class Counsel's attorneys' fees and costs, pay an incentive award to the Plaintiffs, and pay costs and expenses of settlement administration. *See*

"Welcome to the Miller v. Guethner Management Settlement Website, available at https://www.watenantscreeningsettlement.com/.

97. On January 28, 2022, the Court entered a Settlement Order and Final Judgment. *See* Docket No. 2020260432, at Sub Number 22.

98. While the offending conduct in this case occurred after the Class action was settled in *Miller, Jake, et al v Guenther Management, LLC*., and while Guenther Management, LLC was able to settle the matter without actually having to admit any wrongdoing, an inference may be taken by this Court that its willingness to settle the class actions was an implicit admission to having a practice of violating Washington State fair rental laws that regulate matters relating to the criteria relied upon by Guenther that may result in denial of prospective tenants' applications, and doing so in connection with more than 1,000 prospective tenant applications.

## VIII. CAUSES OF ACTION

### COUNT 1
### Fair Housing Act, 42 U.S.C. § 3604 et.seq.
### Disparate Impact Claim
### (Against all Defendants)

99. Plaintiff Ballantyne restates and incorporates by reference paragraphs 1-98, supra, as though fully stated and set forth herein.

100.        The Property offered for rent on the Zillow platform described above is a "dwelling" as defined by the FHA, 42 U.S.C § 3602(b).

101.        The GPM Defendants' policies and practices have a disproportionate adverse impact on Black and Hispanic rental applicants. This disproportionate impact is the direct result of GPM Defendant's primary reliance on an applicant's credit and other non-tenancy debt histories, and its practice of posting a pre-textual credit score criteria and then increasing the

credit score requirements when Black or Hispanic rental applicants apply so as to justify the denial of their application.

102.     Black and Hispanic consumers have disproportionately lower credit scores and worse non-tenancy debt histories than white consumers. Thus, the GPM Defendants' scoring system has had and will continue to have an adverse impact on Black and Hispanic renters.

103.     This disparate impact cannot be justified by business necessity. Although Black and Hispanic renters have disproportionately poorer credit and non-tenancy debt histories than their white counterparts, these histories do not reflect a renter's current lease performance risk.

104.     There are less discriminatory alternatives available that could be used for screening tenants.

105.     The GPM Defendants' policies and practices constitute unlawful discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3604, by: making housing unavailable on the basis of race and national origin in violation of 42 U.S.C. § 3604(a); and  providing different and strategically changing terms and conditions for minority applicants, and discriminating in the provision of services in connection with housing on the basis of race and national origin in violation of 42 U.S.C. § 3604(b).

106.     Plaintiff Ballantyne is an "aggrieved person" as defined by the Fair Housing Act, 42 U.S.C § 3602(i), and has sustained damages as a direct and proximate result of the GPM Defendants' unlawful discriminatory conduct.

107.     Accordingly, under 42 U.S.C § 3613(c), Plaintiff Ballantyne is entitled to actual damages, punitive damages, reasonable attorney's fees, and the award of any appropriate permanent or temporary injunctions against the GPM Defendants.

**COUNT 2**
**Fair Housing Act, 42 U.S.C. § 3604 et.seq.**
**Intentional Discrimination Claim**
**(Against All Defendants)**

108.    Plaintiff Ballantyne restates and incorporates by reference paragraphs 1-98, supra, as though fully stated and set forth herein.

109.    The Property offered for rent on the Zillow platform described above is a "dwelling" as defined by the FHA, 42 U.S.C § 3602(b).

110.    The GPM Defendants' policies and practices of advertising houses for rent with a pretextual rental credit score criteria, and then increasing the credit score requirements when Black or Hispanic rental applicants apply so as to justify the denial of their application,

constitutes unlawful discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3604, by: making housing unavailable on the basis of race and national origin in violation of 42 U.S.C. § 3604(a); and providing different and strategically changing terms and conditions for minority applicants, and discriminating in the provision of services in connection with housing on the basis of race and national origin in violation of 42 U.S.C. § 3604(b).

111.    This intentionally discriminatory policy and practice cannot be justified by business necessity. Although Black and Hispanic renters have disproportionately poorer credit and non-tenancy debt histories than their white counterparts, these histories do not reflect a renter's current lease performance risk.

112.    Black and Hispanic consumers have disproportionately lower credit scores and worse non-tenancy debt histories than white consumers. Thus, the GPM Defendants' pretextual and changing (on the basis of race) scoring system has had and will continue to have an adverse impact on Black and Hispanic renters.

113.    There are less discriminatory alternatives available that could be used for screening tenants.

114.    Plaintiff Ballantyne is an "aggrieved person" as defined by the Fair Housing Act, 42 U.S.C § 3602(i), and has sustained damages as a direct and proximate result of the GPM Defendants' unlawful discriminatory conduct.

115.    Accordingly, under 42 U.S.C § 3613(c), Plaintiff Ballantyne is entitled to actual damages, punitive damages, reasonable attorney's fees, and the award of any appropriate permanent or temporary injunctions against the GPM Defendants.

### COUNT 3
### Washington Law Against Discrimination,
### Declaration of Civil Rights, RCW 49.60.030
### Disparate Impact Claim
### (Against all Defendants)

116.    Plaintiff Ballantyne restates and incorporates by reference paragraphs 1-98, supra, as though fully stated and set forth herein.

117.    The Property offered for rent on the Zillow platform described above is a "dwelling" as defined by the WLAD, Declaration of Civil Rights, RCW 49.60.040(1).

118.    The GPM Defendants' policies and practices have a disproportionate adverse impact on Black and Hispanic rental applicants. This disproportionate impact is the direct result of GPM Defendant's primary reliance on an applicant's credit and other non-tenancy debt histories, and its practice of posting a pre-textual credit score criteria and then increasing the credit score requirements when Black or Hispanic rental applicants apply so as to justify the denial of their application.

119.    Black and Hispanic consumers have disproportionately lower credit scores and worse non-tenancy debt histories than white consumers. Thus, the GPM Defendants' scoring system has had and will continue to have an adverse impact on Black and Hispanic renters.

120.     This disparate impact cannot be justified by business necessity. Although Black and Hispanic renters have disproportionately poorer credit and non-tenancy debt histories than their white counterparts, these histories do not reflect a renter's current lease performance risk.

121.     There are less discriminatory alternatives available that could be used for screening tenants.

122.     The GPM Defendants' policies and practices constitute unlawful discrimination in violation of the WLAD, Declaration of Civil Rights, RCW 49.60.030, by discriminating against Black and Hispanic rental applicants who seek to engage in real estate transactions -- which includes the rental or lease of real property pursuant to RCW 49.60.040(22) -- on the basis of race in violation of RCW 49.60.030(1)(c).

123.     Plaintiff Ballantyne is an "aggrieved person" as defined by the WLAD, Declaration of Civil Rights, RCW 49.60.040(1), and has sustained injuries as a direct and proximate result of the GPM Defendants' unlawful discriminatory conduct.

124.     Accordingly, under RCW 49.60.030, Plaintiff Ballantyne is entitled to actual damages, the cost of the suit including reasonable attorney's fees, and the award of any appropriate injunctions against the GPM Defendants.

**COUNT 4**
**Washington Law Against Discrimination,**
**Declaration of Civil Rights, RCW 49.0.030**
**Intentional Discrimination Claim**
**(Against all Defendants)**

125.     Plaintiff Ballantyne restates and incorporates by reference paragraphs 1-98, supra, as though fully stated and set forth herein.

126.     The Property offered for rent on the Zillow platform described above is a "dwelling" as defined by the WLAD, Declaration of Civil Rights, RCW 49.60.040(1).

127.     The GPM Defendants' policies and practices of advertising houses for rent with a pretextual rental credit score criteria, and then increasing the credit score requirements when Black or Hispanic rental applicants apply so as to justify the denial of their application, constitutes unlawful discrimination in violation of the WLAD, Declaration of Civil Rights, RCW 49.60.030, by discriminating against Black and Hispanic rental applicants who seek to engage in real estate transactions -- which includes the rental or lease of real property pursuant to RCW 49.60.040(22) -- on the basis of race in violation of RCW 49.60.030(1)(c).

128.     This intentionally discriminatory policy and practice cannot be justified by business necessity. Although Black and Hispanic renters have disproportionately poorer credit and non-tenancy debt histories than their white counterparts, these histories do not reflect a renter's current lease performance risk.

129.     Black and Hispanic consumers have disproportionately lower credit scores and worse non-tenancy debt histories than white consumers.    Thus, the GPM Defendants' pretextual and changing (on the basis of race) scoring system has had and will continue to have an adverse impact on Black and Hispanic renters.

130.     There are less discriminatory alternatives available that could be used for screening tenants.

131.     Plaintiff Ballantyne is an "aggrieved person" as defined by the WLAD, Declaration of Civil Rights, RCW 49.60.040(1), and has sustained injuries as a direct and proximate result of the GPM Defendants' unlawful discriminatory conduct.

132.     Accordingly, under RCW 49.60.030, Plaintiff Ballantyne is entitled to actual damages, the cost of the suit including reasonable attorney's fees, and the award of any appropriate injunctions against the GPM Defendants.

**COUNT 5**
**Washington Law Against Discrimination,**
**Unfair Practices with Respect to Real Estate Transactions,**

## RCW 49.60.222- Disparate Impact Claim
### (Against all Defendants)

133.     Plaintiff Ballantyne restates and incorporates by reference paragraphs 1-98, supra, as though fully stated and set forth herein.

134.     The Property offered for rent on the Zillow platform described above is a "dwelling" as defined by the WLAD, RCW 49.60.040(1).

135.     The GPM Defendants' policies and practices have a disproportionate adverse impact on Black and Hispanic rental applicants. This disproportionate impact is the direct result of GPM Defendant's primary reliance on an applicant's credit and other non-tenancy debt histories, and its practice of posting a pre-textual credit score criteria and then increasing the credit score requirements when Black or Hispanic rental applicants apply so as to justify the denial of their application.

136.     Black and Hispanic consumers have disproportionately lower credit scores and worse non-tenancy debt histories than white consumers. Thus, the GPM Defendants' scoring system has had and will continue to have an adverse impact on Black and Hispanic renters.

137.     This disparate impact cannot be justified by business necessity. Although Black and Hispanic renters have disproportionately poorer credit and non-tenancy debt histories than their white counterparts, these histories do not reflect a renter's current lease performance risk.

138.     There are less discriminatory alternatives available that could be used for screening tenants.

139.     The GPM Defendants' policies and practices constitute unlawful unfair practices with respect to real estate transactions of the WLAD, RCW 49.60.222, by:

     a.     discriminating against Black and Hispanic rental applicants in the terms, conditions, or privileges of a real estate transactions -- which includes the rental or lease of real

property pursuant to RCW 49.60.040(22) -- on the basis of race in violation of RCW 49.60.222(1)(b);

      b.     discriminating in the rental or otherwise make unavailable or denying a dwelling to Black and Hispanic rental applicants on the basis of race in violation of RCW 49.60.222(1)(f);

      c.     making, printing, circulating, posting, or mailing, or causing to be so made or published a statement, advertisement, or sign, or to use a form of application for a real estate transaction, or to make a record or inquiry in connection with a prospective real estate transaction, which indicates, directly or indirectly, an intent to make a limitation, specification, or discrimination on the basis of race with respect thereto in violation of RCW 49.60.222(1)(g);

      d.     offering, soliciting, accepting, using, or retaining a listing of real property with the understanding that a person may be discriminated against on the basis of race in a real estate transaction or in the furnishing of facilities or services in connection therewith in violation of RCW 49.60.222(1)(h);

      e.     discriminating on the basis of race in the course of negotiating, executing, or financing a real estate transaction in violation of RCW 49.60.222(1)(j);

      f.     attempting to do any of the unfair practices defined in this section in violation of RCW 49.60.222(1)(k).

140.     Plaintiff Ballantyne is an "aggrieved person" as defined by the WLAD, RCW 49.60.040(1), and has sustained injuries as a direct and proximate result of the GPM Defendants' unlawful discriminatory conduct.

141.     Accordingly, under RCW 49.60.225, Plaintiff Ballantyne is entitled to actual damages and the award of any appropriate injunctions against the GPM Defendants.

**COUNT 6**
**Washington Law Against Discrimination,**

**Unfair Practices with Respect to Real Estate Transactions,**
**RCW 49.60.222- Intentional Discrimination Claim**
**(Against all Defendants)**

142.    Plaintiff Ballantyne restates and incorporates by reference paragraphs 1-98, supra, as though fully stated and set forth herein.

143.    The Property offered for rent on the Zillow platform described above is a "dwelling" as defined by the WLAD, RCW 49.60.040(1).

144.    The GPM Defendants' policies and practices constitute unlawful unfair practices with respect to real estate transactions of the WLAD, RCW 49.60.222, by:

    a.    discriminating against Black and Hispanic rental applicants in the terms, conditions, or privileges of a real estate transactions -- which includes the rental or lease of real property pursuant to RCW 49.60.040(22) -- on the basis of race in violation of RCW 49.60.222(1)(b);

    b.    discriminating in the rental or otherwise make unavailable or denying a dwelling to Black and Hispanic rental applicants on the basis of race in violation of RCW 49.60.222(1)(f);

    c.    making, printing, circulating, posting, or mailing, or causing to be so made or published a statement, advertisement, or sign, or to use a form of application for a real estate transaction, or to make a record or inquiry in connection with a prospective real estate transaction, which indicates, directly or indirectly, an intent to make a limitation, specification, or discrimination on the basis of race with respect thereto in violation of RCW 49.60.222(1)(g);

    d.    offering, soliciting, accepting, using, or retaining a listing of real property with the understanding that a person may be discriminated against on the basis of race in a real estate transaction or in the furnishing of facilities or services in connection therewith in violation of RCW 49.60.222(1)(h);

e.  discriminating on the basis of race in the course of negotiating, executing, or financing a real estate transaction in violation of RCW 49.60.222(1)(j);

f.  attempting to do any of the unfair practices defined in this section in violation of RCW 49.60.222(1)(k).

145.  This intentionally discriminatory policy and practice cannot be justified by business necessity. Although Black and Hispanic renters have disproportionately poorer credit and non-tenancy debt histories than their white counterparts, these histories do not reflect a renter's current lease performance risk.

146.  Black and Hispanic consumers have disproportionately lower credit scores and worse non-tenancy debt histories than white consumers.  Thus, the GPM Defendants' pretextual and changing (on the basis of race) scoring system has had and will continue to have an adverse impact on Black and Hispanic renters.

147.  There are less discriminatory alternatives available that could be used for screening tenants.

148.  Plaintiff Ballantyne is an "aggrieved person" as defined by the WLAD, RCW 49.60.040(1), and has sustained injuries as a direct and proximate result of the GPM Defendants' unlawful discriminatory conduct.

149.  Accordingly, under RCW 49.60.225, Plaintiff Ballantyne is entitled to actual damages and the award of any appropriate injunctions against the GPM Defendants.

## COUNT 7
### Washington Law Against Discrimination,
### Unfair Practice in Aid Violation RCW 49.60.220
### (Against Each Defendant Individually)

150.  Plaintiff Ballantyne restates and incorporates by reference paragraphs 1-98, supra, as though fully stated and set forth herein.

151.     The Property offered for rent on the Zillow platform described above is a "dwelling" as defined by the WLAD, RCW 49.60.040(1).

152.     The GPM Defendants' policies and practices have a disproportionate adverse impact on Black and Hispanic rental applicants. This disproportionate impact is the direct result of GPM Defendant's primary reliance on an applicant's credit and other non-tenancy debt histories, and its practice of posting a pre-textual credit score criteria and then increasing the credit score requirements when Black or Hispanic rental applicants apply so as to justify the denial of their application.

153.     Black and Hispanic consumers have disproportionately lower credit scores and worse non-tenancy debt histories than white consumers. Thus, the GPM Defendants' scoring system has had and will continue to have an adverse impact on Black and Hispanic renters.

154.     This disparate impact cannot be justified by business necessity. Although Black and Hispanic renters have disproportionately poorer credit and non-tenancy debt histories than their white counterparts, these histories do not reflect a renter's current lease performance risk.

155.     There are less discriminatory alternatives available that could be used for screening tenants.

156.     The GPM Defendants' policies and practices constitute unlawful unfair practices with respect to real estate transactions of the WLAD, RCW 49.60.222, by:

> a.  discriminating against Black and Hispanic rental applicants in the terms, conditions, or privileges of a real estate transactions -- which includes the rental or lease of real property pursuant to RCW 49.60.040(22) -- on the basis of race in violation of RCW 49.60.222(1)(b);

b. discriminating in the rental or otherwise make unavailable or denying a dwelling to Black and Hispanic rental applicants on the basis of race in violation of RCW 49.60.222(1)(f);

c. making, printing, circulating, posting, or mailing, or causing to be so made or published a statement, advertisement, or sign, or to use a form of application for a real estate transaction, or to make a record or inquiry in connection with a prospective real estate transaction, which indicates, directly or indirectly, an intent to make a limitation, specification, or discrimination on the basis of race with respect thereto in violation of RCW 49.60.222(1)(g);

d. offering, soliciting, accepting, using, or retaining a listing of real property with the understanding that a person may be discriminated against on the basis of race in a real estate transaction or in the furnishing of facilities or services in connection therewith in violation of RCW 49.60.222(1)(h);

e. discriminating on the basis of race in the course of negotiating, executing, or financing a real estate transaction in violation of RCW 49.60.222(1)(j);

f. attempting to do any of the unfair practices defined in this section in violation of RCW 49.60.222(1)(k).

157.     Each of the named Defendants aided, abetted, encouraged, or incited the commission of at least one of the unfair practices listed in the paragraph immediately above, or to attempt to obstruct or prevent any other person from complying with the provisions of the WLAD, and in particular RCW 49.60.222, in violation of RCW 49.60.220.

158.     Plaintiff Ballantyne is an "aggrieved person" as defined by the WLAD, RCW 49.60.040(1), and has sustained injuries as a direct and proximate result of the GPM Defendants' unlawful discriminatory conduct.

159.    Accordingly, under RCW 49.60.225, Plaintiff Ballantyne is entitled to actual damages and the award of any appropriate injunctions against the GPM Defendants.

## COUNT 8
### Intentional Infliction of Emotional Distress
### (Against All Defendants)

160.    Plaintiff Ballantyne restates and incorporates by reference paragraphs 1-98, supra, as though fully stated and set forth herein.

161.    The GPM Defendants discriminated against Plaintiff Ballantyne on the basis of his race.

162.    The GPM Defendants' manipulation of the rental criteria as a means of preventing him from renting a home for he and his family constituted outrageous conduct that is so extreme as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community.

163.    The GPM Defendants' actions were intentional and reckless.

164.    The GPM Defendants knew that their actions would result in Plaintiff's severe and serious emotional distress by causing his inability to provide housing for him and his family depriving them of the comfort, stability and safety of residing in their own home.

165.    Defendants' actions directly and proximately caused Plaintiff to suffer severe emotional distress, fear of harm, embarrassment, humiliation, loss of sleep, and mental anguish.

166.    Plaintiff is entitled to punitive and/or exemplary damages.

## COUNT 9
### Negligent Infliction of Emotional Distress
### (Against All Defendants)

167.    Plaintiff Ballantyne restates and incorporates by reference paragraphs 1-98, supra, as though fully stated and set forth herein.

168.    The GPM Defendants discriminated against Plaintiff Ballantyne on the basis of his race.

169.    The GPM Defendants' manipulation of the rental criteria as a means of preventing him from renting a home for he and his family constituted outrageous conduct that is so extreme as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community.

170.    The GPM Defendants' actions were negligent and reckless.

171.    The GPM Defendants knew or should have known that their actions would result in Plaintiff's severe and serious emotional distress by causing his inability to provide housing for him and his family depriving them of the comfort, stability and safety of residing in their own home.

172.    Defendants' actions directly and proximately caused Plaintiff Ballantyne to suffer severe emotional distress, fear of harm, embarrassment, humiliation, loss of sleep, and mental anguish.

173.    Plaintiff Ballantyne is entitled to punitive and/or exemplary damages.

## COUNT 10
## Negligent Retention
## (Against Defendant GPM)

174.    Plaintiff Ballantyne restates and incorporates by reference paragraphs 1-99, supra, as though fully stated and set forth herein.

175.    The GPM Defendant had a legal obligation and duty to ensure that its Designated Broker(s), Managing Broker(s), Agent(s) and employee(s) in charge of implementing and maintaining the policies and procedures for screening and accepting renters were well trained and supervised so that they would not engage in discrimination against Black and Hispanic rental applicants like Plaintiff Ballantyne.

176.     The state and federal fair housing laws enhanced and solemn duty of reasonable care to protect Black and Hispanic rental applicants from discriminatory policies and procedures in their efforts to rent property's managed by the GPM Defendant.

177.     By virtue of the facts set forth above, the GPM Defendant hired and retained the offending Designated Broker(s), Managing Broker(s), Broker(s), Agent(s) and Employee(s), even though it knew or should have known that they were unfit to set rental criteria and evaluate rental application.

178.     The GPM Defendant's negligence and the offending Designated Broker's, Managing Broker's, Broker's, Agent's and Employee's conduct caused injury to Plaintiff Ballantyne.

### COUNT 11
### Negligent Training and Supervision
### (Against Defendant GPM)

179.     Plaintiff Ballantyne restates and incorporates by reference paragraphs 1-99, supra, as though fully stated and set forth herein.

180.     By virtue of the facts set forth above, the GPM Defendant knew or should have known that the offending Designated Broker(s), Managing Broker(s), Broker(s), Agent(s) and Employee(s), presented a risk of unfitness, and the GPM Defendant failed to exercise reasonable care to prevent the offending Designated Broker(s), Managing Broker(s), Broker(s), Agent(s) and Employee(s)  to prevent them from intentionally discriminating and harming Black and Hispanic rental applicants.

181.     The GPM Defendant's negligence and the offending Designated Broker's, Managing Broker's, Broker's, Agent's and Employee's conduct caused injury to Plaintiff Ballantyne

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully request judgment against GPM Defendants as follows:

1. Declaring Defendants' discriminatory practices violate the Fair Housing Act, as amended, 42 U.S.C. § 3601 et seq., the Washington Law Against Discrimination, Declaration of Civil Rights, RCW 49.60.030, the Washington Law Against Discrimination, Unfair Practices with Respect to Real Estate Transactions, 49.60.222(1)(b), and the Washington Residential Landlord-Tenant Act, at chapter RCW 59.18.257.

2. Enjoining the GPM Defendants, their agents, employees and successors, and all other persons in active concert or participation from:

    a.    Withholding housing, or otherwise making housing unavailable on the basis of race;

    b.    Aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden by the federal Fair Housing Act, the Washington Law Against Discrimination, Declaration of Civil Rights, and the Washington Law Against Discrimination, Unfair Practices with Respect to Real Estate Transactions;

3. Enjoining Defendants and their agents, employees, and successors, and all other persons in active concert or participation to:

    a.    Make all necessary modifications to their policies, practices and procedures to comply with federal Fair Housing Act, the Washington Law Against Discrimination, Declaration of Civil Rights, and the Washington Law Against Discrimination, Unfair Practices with Respect to Real Estate Transactions;

    b.    Train all management, agents and employees on federal Fair Housing Act, the Washington Law Against Discrimination, Declaration of Civil Rights, and the Washington Law Against Discrimination, Unfair Practices with Respect to Real Estate Transactions;

        c.     Monitor tenant screening outcome data to prevent discrimination against Black and Hispanic applicants;

4. An award of all damages that Plaintiff Ballantyne has sustained as a result of the GPM Defendant's conduct, including statutory damages;

5. An award of compensatory damages, including damages for emotional distress and breach of contract;

6. Awarding Plaintiffs reasonable attorneys' fees, costs and expenses incurred in prosecuting this action; and

7. Granting Plaintiffs such other further relief as may be just and proper.

## JURY DEMAND

8. Plaintiffs hereby demand a trial on the merits by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

March 18, 2024

By: _____

Nathaniel Manny Ballantyne, JD
6805 N. Belt Street
Spokane, WA 99208
Tel: 509-850-7442
Email: Mballantyne@morrislegalfla.com